**Paul PIGHEE, Plaintiff**

v.

**L'OREAL USA [PRODUCTS], INC., Defendant.**

**No. 4:03CV00443 JLH.**

United States District Court,
E.D. Arkansas,
Western Division.

Jan. 12, 2005.

Stephen E. Fisher, Fisher Law Firm, Little Rock, AR, for Plaintiff.

M. Tim Boe, David P. Martin, John D. Coulter, Rose Law Firm, Little Rock, AR, for Defendant.

## *OPINION AND ORDER*

HOLMES, District Judge.

This case comes before this Court on L'Oreal USA Products, Inc.'s motion for summary judgment (Docket # 8). Paul Pighee filed this action against L'Oreal, his former employer, claiming that L'Oreal terminated his employment on the basis of his race and in retaliation for Pighee's

participation in protected activity. Pighee brings race and retaliation claims under Title VII, 42 U.S.C. § 2000e, First and Fourteenth Amendment claims under the United States Constitution, and claims for outrage, tortious interference, and slander under state common law. In support of its motion for summary judgment, L'Oreal attaches an affidavit from Dave Coombs, L'Oreal's Human Resources Director, contents of Pighee's personnel file, contents of the personnel file of Mike Renner, a former L'Oreal employee, L'Oreal's sexual harassment policy, excerpts from the Equal Employment Opportunity Commission Investigative File, and portions of two depositions of Pighee. In support of his response to this motion, Pighee attaches an affidavit from Renner.[1] For the reasons contained herein, L'Oreal's motion will be granted in its entirety.

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.,* 344 F.3d 753, 763 (8th Cir. 2003). When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(c)). The non-moving party sustains this burden by showing that "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. In deciding a motion for summary judgment, the Court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.,* 260 F.3d 837, 841 (8th Cir.2001). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.,* 77 F.3d 263, 264 (8th Cir.1996).

The facts are as follows.[2] Pighee, an African–American, worked for L'Oreal as a

---

1. L'Oreal moves to strike portions of this affidavit (Docket # 20), arguing that statements made in the affidavit failed to comport with the requirements of Fed.R.Civ.P. 56(e). The Court denies this motion. In adjudicating L'Oreal's motion for summary judgment, the Court will consider admissible portions, if any, of the affidavit which create a genuine issue of material fact.

2. In response to L'Oreal's statement of undisputed facts as to which there is no genuine issue to be tried, Pighee filed a separate statement including seven facts in dispute. The Court finds that these facts are largely conclusory and unsupported by evidence and fail to contradict the facts presented by L'Oreal. Pursuant to Local Rule 56.1, the Court deems L'Oreal's statement admitted.

mechanic in its North Little Rock, Arkansas facility beginning in 1995. On several occasions during his employment, Pighee was disciplined for attendance policy violations and for comments that other employees perceived as physically threatening. For the attendance violations, Pighee received a verbal warning, a written warning, and, finally on March 2001, a second and final written warning. For the perceived threatening comments, Pighee was issued a written warning on March 5, 1997, stating that "any type of behavior that would be perceived as threatening in the future will be reason for your immediate dismissal" and a documented verbal warning on March 3, 2000.

In 2000, a fellow employee brought a Title VII race discrimination lawsuit against L'Oreal and identified Pighee and at least five other L'Oreal employees as potential witnesses. In August 2001, Pighee testified by oral deposition in that lawsuit. During the deposition, Pighee testified that he had once organized a group of black mechanics and line workers that met with L'Oreal officials, including Coombs, to discuss job concerns. He stated that the meeting was constructive and that the attendees were "thoroughly satisfied" with what Coombs said during the meeting.

In 2001, L'Oreal began to receive reports of sexual harassment concerning Pighee. First, Cleo Hogan, a female African–American co-worker of Pighee's, reported to her supervisor that a male mechanic in her department had touched her and made inappropriate comments. Hogan's supervisor reported the allegations to Coombs who then spoke with Hogan. Hogan would not tell Coombs who was harassing her out of alleged fear for her safety. She also requested that her identity not be disclosed. In the course of investigating Hogan's complaint, Coombs spoke with Amanda Clingham, who alleged that Pighee had also made sexually explicit comments to her. Clingham told Coombs that Hogan had complained to her about Pighee's conduct. Clingham also requested that she remain anonymous.

On December 7, 2001, Coombs and Steve Kottakis, the Director of Hogan's department, met with Pighee to inform him that allegations of sexual harassment had been made against him. Because of the two women's requests, Coombs did not tell him who made the allegations or provide him with details of the specific allegations. Pighee denied engaging in any inappropriate conduct. Coombs reviewed with Pighee the company's sexual harassment policy[3] and informed him that fur-

---

**3.** The L'Oreal Sexual Harassment Policy's definition of sexual harassment covers "unwelcome or unsolicited sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when: ... 3) this conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment."

The policy also sets forth procedures for reporting and investigating sexual harassment as follows:

Any employee who believes he/she has been harassed by a co-worker ... of the Company or is offended by certain behaviors in the workplace should promptly report the facts of the incident or incidents to his/her manager or a Human Resources representative. All complaints will be promptly investigated by appropriate management or Human Resources in as confidential a manner as is compatible with a thorough investigation of the complaint and with respect to the rights of the accused and accuser. If, after investigation, it is determined by Human Resources that sexual harassment has taken place, appropriate corrective action will be taken. Corrective action may range from verbal warnings to termination, depending on the outcome of the investigation.

ther complaints would be investigated and met with appropriate disciplinary action.

In February 2002, Hogan again complained of harassment, claiming also that others were hesitant to report Pighee's conduct out of intimidation. An investigation ensued, uncovering another allegation from a female employee that Pighee had told co-workers that she and he were having an affair. This female too requested that her identity be kept confidential. On May 8, 2002, Pighee was issued a written warning, informing him that additional reports of unwelcome sexual advances had been made since the December meeting. The warning stated that "[i]f these allegations prove to be true you will be subject to appropriate disciplinary action up to and including termination." Pighee again denied any inappropriate behavior at this time.

After the written warning, Coombs received another report of Pighee's continued harassment towards Hogan. By this point, the allegations L'Oreal had collected against Pighee included that he had asked Hogan if he could "eat her p* * *y"; that he had told Hogan how "horny" he was and that he would like to "f* *k [her] from behind"; that he had approached Hogan from behind and rubbed his body against hers; that he had placed his hand between Hogan's legs; that he had asked Hogan to go with him into a mechanic's closet and, on another occasion, to meet him in a secluded spot; that he had stated to female employees that they were "like shirts, you see all of them in the mall and you just want one" and that he "wished [he] could have sex" with them; and that he had informed them "how big [his] groin" is. Several other reports surfaced, including that Pighee had brought porno-

graphic videos and nude photographs of himself to the workplace, had exposed his underwear to a female employee, and had interrogated co-workers in an attempt to discover who had made the complaints. Coombs again commenced an investigation and discovered another female employee who alleged that Pighee had sexually harassed her in the past. This woman also requested anonymity.

Finally, Hogan gave Coombs permission to disclose her identity to Pighee. According to Pighee's deposition testimony, Coombs arranged a meeting in late July 2002, at which Hogan confronted Pighee with her allegations. In response to the accusations, Pighee stated, "[w]ell, you know, I know they're not true, and if we're going—if this is who you brought in here to accuse me of sexual harassment, you know, I just really didn't have anything else to say. Because I hadn't—I hadn't done or said anything to Cleo."

On July 29, 2002, L'Oreal informed Pighee that he had repeatedly violated L'Oreal's sexual harassment policy despite prior warnings. It gave Pighee the option of resigning or being discharged. Because Pighee stated that he couldn't resign, he was terminated.

## I. Constitutional Claims

 Pighee brings claims under the First and Fourteenth Amendments of the United States Constitution, claiming that his supervisors treated him differently than others similarly situated for the purpose of " 'chilling' any exercise of his free speech rights" and that they "conspired with themselves and others to deny plaintiff due process." It is well-settled that these rights can be asserted only against

In all cases, a complaint must be treated in a timely manner with seriousness, sensitivity and confidentiality. Retaliation against an individual for exercising his/her rights under this policy will not be tolerated and can result in immediate dismissal.

state actors. *Alexander v. Pathfinder, Inc.,* 189 F.3d 735, 740 (8th Cir.1999); *Niere v. St. Louis County, Mo.,* 305 F.3d 834, 838 (8th Cir.2002). L'Oreal is a privately owned and operated corporation. As Pighee has not claimed any harm by governmental action, L'Oreal is entitled to summary judgment on these claims.

## II. Race Discrimination

■ Pighee brings a Title VII race discrimination claim. Under Title VII, an employer cannot discharge or otherwise "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). In the absence of direct evidence of discrimination, a Title VII claim is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Pighee must carry the initial burden of establishing a *prima facie* case of racial discrimination. To do this, he must show that 1) he was a member of a protected group, 2) he was meeting the legitimate expectations of his employer, 3) he suffered an adverse employment action, and 4) that similarly situated employees who are not members of the protected group were treated differently. *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000). If Pighee makes out this *prima facie* case, the burden then shifts to L'Oreal to identify a legitimate reason for terminating his employment. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If L'Oreal meets its burden of articulating a legitimate, non-discriminatory reason for the discharge, Pighee must then prove that the articulated reason was a pretext. *See id.* at 804, 93 S.Ct. 1817.

The question is whether Pighee creates a genuine issue of material fact on his claim that similarly situated white employees were treated differently by L'Oreal. In order to make out a *prima facie* case, Pighee need only make a minimal showing on this issue. *See Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir.2004). This Court does not believe that he has. Even if Pighee can make out such a showing, however, L'Oreal has articulated a legitimate, nondiscriminatory reason for the termination. Thus, in order to avoid summary judgment, Pighee would have to present sufficient evidence to raise a question of material fact as to whether L'Oreal's proffered reason was pretextual and to create a reasonable inference of racial discrimination. *Fisher v. Pharmacia & Upjohn,* 225 F.3d 915, 921 (8th Cir.2000). One of the most common methods of demonstrating pretext in a racial discrimination case is to show that similarly situated persons of a different race received more favorable treatment. *Cherry,* 361 F.3d at 479. The test used to determine whether an employee is similarly situated so as to warrant comparison to the plaintiff is a rigorous one, in particular at the pretext stage when "more substantial evidence" is required than when making out a *prima facie* case. *Id; Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 726–27 (8th Cir. 2001).

Pighee claims that white employees who were accused of sexual harassment were treated differently in that they were provided with the details of the allegations made against them, they were allowed to defend themselves against these allegations, and that ultimately, they were not terminated.

Pighee claims that Rob Richey, Tim Davis, and Mike Renner are white employees who were similarly situated but who were treated differently. He attaches an affidavit from Renner. In that affidavit, Renner summarizes his employment history at L'Oreal and states that during his

time there he was accused of sexual harassment several times. He refers specifically to an incident when he showed another employee pornographic materials, claiming that he was written up by L'Oreal management but that no investigation followed.[4] He also references other incidents when he called female employees "lard asses or blubber butts" and allegedly commented on a female's breast size. Renner states that he was accused of sexual harassment by a woman named Carol Forester and was suspended for three days, sent to counseling, and put on probation for a period of one year. Renner also states that he was accused of being drunk on the job and of cutting wires on a production line.

In rebuttal, L'Oreal claims that it is aware of four males, including Pighee, whom it discharged for sexual harassment since 1991. Two of these males are white and two are African–American. Coombs states that he used the same procedure to investigate Pighee's conduct as he used to investigate other allegations of inappropriate conduct at L'Oreal. L'Oreal argues that, with the exception of not identifying the complainants to Pighee, it treated each white employee as it did Pighee by first investigating the complaint and then speaking with the person against whom the complaint was lodged. As for the three white employees Pighee claims were treated differently, Coombs addresses each situation in his affidavit.

With regard to Davis, Coombs states that around May 1999, L'Oreal received a complaint that Davis had asked a female employee out on a date several times despite the fact that this employee told him that she was not interested. After the

female complained to L'Oreal, company officials spoke with Davis who assured them that this conduct would stop. L'Oreal informed Davis that should there be further issues, it would investigate and take appropriate action. A memorandum was placed in Davis's personnel file, but no further complaints were made concerning him. As for Richey, Coombs states that around August 2000, a female employee complained to L'Oreal that Richey had made sexually suggestive comments to her and invited her out for a drink after work several times. Company officials spoke to Richey who denied the allegations. The company gave him a warning and told him that L'Oreal would investigate any future allegations and take appropriate actions. A memorandum documenting this action was placed in his file, but as with Davis, no further complaints were made concerning his conduct. Lastly, as for Renner, L'Oreal received various complaints concerning his conduct during his employment, not all involving sexual harassment. In August 1999, he was accused of making racially derogatory comments and received a documented verbal warning. Around March 2002, Renner was accused of bringing pornographic material to work, which Renner claimed he received from another employee. Renner met with two L'Oreal officials who warned him that participation in such activity was prohibited. He was issued a documented verbal warning. In June and again in August 2002, L'Oreal received complaints that Renner had made derogatory comments regarding weight and race. Renner received a written warning and then a second written warning. In September 2002, Renner was accused of asking a female employee who had walked

4. L'Oreal's Corrective Action Record dated 3/5/02 shows that Renner met with two L'Oreal officials to discuss this allegation, that he denied that he brought the material in, and that the officials warned him that participation in these types of actions would result in more severe corrective action.

behind him whether it was "as good for you as it was for me." After investigating and determining that this action coupled with the previous warnings were grounds for termination, Coombs issued him a final warning/last chance agreement in lieu of termination. The terms of the agreement called for one year of probation and counseling. Finally, in August 2003, Renner was terminated after a verbal altercation with another employee.

Pighee's argument that the investigation procedures were discriminately applied to his case must fail. Pighee argues that L'Oreal withheld the identity of the accusers and the specific allegations because of his race, thus making it impossible for him to defend himself. L'Oreal, however, states that in none of the three cases Pighee claims are similar did the accusers request that their identities not be disclosed. Coombs affirms that he concealed the women's identities in Pighee's case out of consideration of the women's requests and in compliance with the company's policy. Pighee has offered no evidence to the contrary. Additionally, once Hogan gave her permission, Coombs arranged for Hogan to confront Pighee regarding the specific allegations. Since Pighee makes a race discrimination claim, the issue is not whether he could adequately defend himself given the confidential manner in which L'Oreal treated this matter; the issue is whether similarly situated white employees were treated differently when it came to investigation procedures. Pighee has not presented this Court any evidence that the three men he identifies were similarly situated in such a way that shows that terminating him for "violations" of the sexual harassment policy was pretextual.

Pighee secondly argues that L'Oreal conducted an insufficient investigation into the allegations against him and claims that watching video surveillance film from the facility would have proven his innocence. For the same reason as above, this argument fails. Pighee has failed to present this Court with any evidence that L'Oreal conducted his investigation differently than it did in other cases.

■ Next, Pighee argues that the white employees were treated differently because they were not ultimately terminated for their conduct. Pighee has the burden of demonstrating that the individuals were similarly situated to him in all relevant aspects. *See Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994). It is not L'Oreal's burden to prove dissimilarity. *See Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988). With regard to Davis and Richey, no reasonable jury could find that these men were similarly situated in all relevant respects. *Cf. Jones v. Frank*, 973 F.2d 673, 676–77 (8th Cir.1992). After the initial warnings given to each of these men, neither caused further problems or became the subject of later complaints. In Pighee's case, Pighee was the subject of multiple investigations regarding alleged conduct that continued despite warning. Because Davis and Richey were not similarly situated, the fact that neither was terminated is not material.

■ With Renner, the situation calls for closer analysis. The Eighth Circuit has held that "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct *without any mitigating or distinguishing circumstances.*" *Clark*, 218 F.3d at 918 (emphasis added). Pighee must establish that Renner's acts were of "comparable seriousness" to his own conduct. *Lanear*, 843 F.2d at 301. Based on the evidence produced, Pighee has not met this burden. Pighee is correct that Renner was treated more leniently than he in that he was given more than one written

warning, was suspended, sent to counseling, and put on probation, and was fired only after a verbal altercation with another employee. However, Renner's conduct was not comparably serious to Pighee's. The allegations from female employees against Pighee involved forced physical contact under the shirt and between the legs of female co-workers, repeated inappropriate comments of a more sexually explicit nature than those made by Renner, attempts to determine who had reported him to management, and, moreover, indications that the females feared for their safety if their identities were disclosed.[5] Further aggravating Pighee's situation was the fact that he had been disciplined in the past for conduct which others perceived as threatening. *Cf. Clark v. Runyon*, 218 F.3d at 918–19 (8th Cir.2000). Because this Court cannot find that Renner was similarly situated, Pighee has failed to create a genuine issue of material fact showing that "the proffered explanation had no basis in fact," that similarly situated white employees "received more favorable treatment," or that it was "unlikely [L'Oreal] would have acted on the basis of the proffered reason" in the absence of discrimination. *Erickson*, 271 F.3d at 727. For this reason, L'Oreal is entitled to summary judgment on the race discrimination claim.

### III. Retaliation

■■■ Pighee also brings a retaliation claim under Title VII, contending that he was unlawfully retaliated against because he arranged for African–American mechanics and line workers to meet with L'Oreal officials regarding job concerns and because he gave deposition testimony in Title VII litigation against L'Oreal. Under Title VII, it is unlawful for an employer to discriminate against an employee "because he has . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Pighee must establish a *prima facie* case of retaliation by showing that he engaged in a protected activity, that an adverse employment action occurred, and that there is a causal connection between the two events. *Jackson v. Flint Ink North Am. Corp.*, 370 F.3d 791, 797 (8th Cir.2004). If he makes such a showing, the burden of production then shifts to L'Oreal to rebut this presumption of discrimination. *Id.* Since L'Oreal offered a legitimate, nondiscriminatory reason for the termination, Pighee also has the burden to identify specific facts in the record showing that the offered reason was merely pretextual and that unlawful retaliation was the true motivating factor. *Crossley v. Georgia–Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir.2004).

Even assuming that Pighee could make out a *prima facie* case on the retaliation claim, he has failed to meet his burden of showing that L'Oreal's stated reason was pretextual. With regard to the meeting Pighee organized, five of the seven African–American attendees are still employed by L'Oreal. Richie Gaines, one of the attendees, voluntarily resigned; only Pighee was involuntarily terminated. Pighee argues in his brief that this is due to the fact that L'Oreal retaliated against him because of his role in organizing the meet-

---

**5.** This Court need not determine the veracity of these allegations. While Pighee asserts that the accusations against him were unfounded, his deposition testimony is unsubstantiated. This Court will not disturb L'Oreal's decision to credit the accusations of the female employees after investigating the situation absent bad faith or unreasonableness. *See Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir.2001); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995).

ing. Without more than a mere assertion, however, no reasonable juror could conclude that L'Oreal's stated reason was pretextual, especially given Pighee's testimony in 2001 that the meeting was successful and that those who attended were "thoroughly satisfied" with what Coombs had told them. Pighee also testified at that time that he had not seen Coombs do anything that he considered racially discriminatory and that whenever he brought a concern to Coombs, Coombs investigated the matter and resolved it to the best of his ability. Such testimony does not invoke a ready inference that L'Oreal would later retaliate against Pighee for his part in calling the meeting. With regard to his deposition testimony, the evidence is likewise insufficient to create a genuine issue of fact of pretext. Of the six employees who gave depositions, one other employee, a Hispanic male, no longer works for L'Oreal; the other four who testified, including the African–American plaintiff and an African–American female, were still employed by L'Oreal when this suit was filed. Under the burden shifting approach, Pighee cannot defeat summary judgment merely by asserting that the reason is pretextual. He must come forward with sufficient evidence demonstrating that a factual issue has been created and that a reasonable juror could conclude that despite the proffered reason, he was fired for an unlawful one. He has failed to do so.

## IV. State Law Claims

### A. Defamation

 A plaintiff must prove the following elements to support a claim of defamation: (1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Superior Fed. Bank v. Mackey,* 84 Ark.App. 1, 12, 129 S.W.3d 324, 331 (2003). Arkansas law recognizes a qualified privilege in cases of employers and supervisory employees. *Puckett v. Cook,* 864 F.2d 619, 621–22 (8th Cir.1989). A defamation claim will fail under Arkansas law unless there is an abuse of privilege or communication to a non-privileged third party. *Id.* Coombs states that he told only L'Oreal management officials with a need-to-know about the allegations. Pighee testified that no one told him that they learned of the allegations from a L'Oreal official or manager, but attempts to establish communication to a non-privileged third party based on the fact that "people on the floor [of the L'Oreal facility knew] about it." He argues that since the complainants wished to remain anonymous, it seems more likely than not that the other employees were told by some L'Oreal official. Pighee cites no law that would allow this Court to find such unsubstantiated and speculative assertions sufficient to create a genuine issue of material fact on the issue. Based on the lack of evidence that L'Oreal abused its qualified privilege or communicated this information to a non-privileged third party, L'Oreal is entitled to summary judgment on this claim.

### B. Intentional Infliction Of Emotional Distress

 In order to sustain an action for outrage, a plaintiff must prove four elements:

(1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized

community"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Crockett v. Essex,* 341 Ark. 558, 563–564, 19 S.W.3d 585, 589 (2000). The standard that a plaintiff must meet in order to satisfy the elements of outrage in Arkansas "is an exceptionally high one." *Kelley v. Georgia–Pacific Corp.,* 300 F.3d 910, 912 (8th Cir.2002). In the employment context the standard is even higher. *Id.* (citing *Palmer v. Ark. Council on Econ. Educ.,* 344 Ark. 461, 40 S.W.3d 784 (2001)); *Faulkner v. Ark. Children's Hosp.,* 347 Ark. 941, 958, 69 S.W.3d 393, 404 (2002); *Freeman v. Bechtel Constr. Co.,* 87 F.3d 1029, 1031 (8th Cir.1996).

 Pighee argues that his claim is predicated on L'Oreal informing Pighee that he violated the company's sexual harassment policy without initially disclosing to him the identity of his accusers or the specifics of the allegations. He also bases his claim on L'Oreal's failure to investigate his claim by watching the video surveillance film. Under Arkansas law, however, employers have great latitude in dealing with their employees, especially in matters involving discharge. *See City of Green Forest v. Morse,* 316 Ark. 540, 542, 873 S.W.2d 155, 156 (1994). Pighee cites no law in support of his arguments nor does he produce evidence that would allow this Court to find that such actions could be construed as "outrageous." Pighee fails to create a genuine issue of material fact and thus summary judgment must be granted in favor of L'Oreal.

**C. Intentional Interference With Contractual Rights**

 In Arkansas, to bring a claim of tortious interference with the contractual rights and relationships of another, a plaintiff must establish "(1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the third party; (3) intentional and improper interference by that third party inducing or causing a breach or termination of the relationship; and (4) resulting damage to the plaintiff." *Palmer,* 344 Ark. at 473, 40 S.W.3d at 791. "An action for tortious interference with a contractual relationship is based upon a defendant's conduct *toward a third party.*" *Id.* (emphasis added). Pighee brings this action against L'Oreal and thus cannot sustain a claim for tortious interference. For this reason, summary judgment in favor of L'Oreal is appropriate.

## CONCLUSION

For the reasons stated above, L'Oreal's motion for summary judgment is GRANTED in its entirety.